J-S11032-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: J.H.-N., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.H., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2785 EDA 2023 |

Appeal from the Order Entered October 3, 2023
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0000776-2021

| | | |
|---|---|---|
| IN THE INTEREST OF: J.J.H.-N., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.H., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2786 EDA 2023 |

Appeal from the Decree Entered October 3, 2023
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000267-2023

BEFORE:   BOWES, J., McLAUGHLIN, J., and COLINS, J.[*]

MEMORANDUM BY COLINS, J.:                    **FILED JUNE 21, 2024**

J.H. ("Father") appeals from the October 3, 2023 decree entered in the

Court of Common Pleas of Philadelphia County, Juvenile Division ("trial

court"), which involuntary terminated his parental rights to his son, J.H.-N.

("Child"), born in July 2021.  Father also appeals from the order of that same

_____

[*] Retired Senior Judge assigned to the Superior Court.

date, which changed the permanent placement goal for Child from reunification to adoption. After careful review, we affirm.

In July 2021, the Department of Human Services of the City of Philadelphia ("DHS") received a report from the hospital where Child was born that J.N. ("Mother") and Child tested positive for PCP. On July 30, 2021, the trial court granted DHS's application for shelter care, and on August 9, 2021, Child was placed with his current foster mother. DHS filed a dependency petition on August 5, 2021, but a hearing on that petition was continued several times, including on August 11 and September 14, 2021, to await the paternity test that confirmed that Father is Child's parent. The dependency hearing was also continued on November 18, 2021, upon the court learning that Father was incarcerated at a Philadelphia County correctional facility. Finally, after a hearing on February 17, 2022, Child was adjudicated dependent.

Permanency review hearings were held on May 5, 2022, September 1, 2022, December 1, 2022, February 21, 2023, May 9, 2023, and August 1, 2023. At the May 5, 2022 hearing, Father's criminal extract was admitted into evidence indicating that his 2021 legal issues arose out of a driving under the influence ("DUI") charge, and the permanency order of that date indicated that Father was involved in drug and alcohol treatment through the criminal justice system. At the December 1, 2022 hearing, it was reported that Father had been arrested on November 19, 2022, and remained incarcerated as of the date of the hearing. Father was provided with weekly visitation with Child

throughout the duration of the case, with the visits increasing from one to two hours after the December 1, 2022 hearing but remaining supervised at the office of the Community Umbrella Agency ("CUA") throughout the case.

On July 21, 2023, DHS filed a petition to terminate Father's parental rights to Child pursuant to Section 2511(a)(1), (2), (5), and (8) of the Adoption Act, as well as subsection (b) of that same provision. 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), (b). On that same date, DHS also filed a petition to change Child's permanency goal to adoption and a petition to terminate Mother's parental rights. A hearing was held on the termination petitions and the goal change petition on October 3, 2023, at which the CUA case manager, Kate Mensinger, and Father testified.[1]

_____

[1] Child was represented by a guardian *ad litem* ("GAL") in the dependency matter, **see** 42 Pa.C.S. § 6311(a) (requiring the appointment of a GAL in dependency proceedings), and the GAL continued to represent Child through the October 3, 2013 hearing on the termination and goal change petitions. There is no separate order reappointing the GAL to represent Child in the adoption docket created following the filing of the termination petition, no separate counsel entered an appearance on behalf of Child in that matter, and the hearing transcript indicates that the GAL only served in that role and not also as Child's legal interests counsel. **See** N.T., 10/3/23, at 2.

Pursuant to Section 2313(a) of the Adoption Act, 23 Pa.C.S. § 2313(a), the trial court is required "to appoint counsel to serve the critical role of a child's attorney, zealously advocating for the legal interests of the child who otherwise would be denied a voice in the termination of parental rights proceedings." **In re Adoption of K.M.G.**, 240 A.3d 1218, 1233-34 (Pa. 2020); **see also In re T.S.**, 192 A.3d 1080, 1092 (Pa. 2018). The question of whether legal interests counsel was appointed for the child is subject to our *sua sponte* review even where not raised by the parties. **K.M.G.**, 240 A.3d at 1235; **see also id.** at 1235-36 (appellate court should also review *sua sponte* whether child's best and legal interests conflict where trial court appoints

*(Footnote Continued Next Page)*

Mensinger testified that single case plan objectives were established for Father, requiring him to (1) follow through with drug and alcohol treatment and provide a treatment plan, (2) participate in behavioral health treatment and provide a treatment plan to CUA, (3) obtain suitable and stable housing and provide CUA with a copy of his lease, (4) complete a parenting class, (5) address domestic violence issues and follow through with any recommendation of a domestic violence consult, and (6) attend visitation with Child. N.T., 10/3/23, at 16-17. Mensinger stated that she communicated the single case plan objectives to Father in person, and she believed that he understood that compliance with the single case plan objectives was necessary in order for him to achieve reunification with Child. *Id.* at 32.

---

single attorney to jointly serve as GAL and legal interests counsel). However, our Supreme Court has recognized that where the child in question is "very young and pre-verbal, there can be no conflict between the child's legal interests and his or her best interests," and therefore Section 2313(a) is satisfied where a GAL represents the child's best interests in the proceedings. *T.S.*, 192 A.3d at 1092-93; *see also id.* at 1090 (where the child is non-communicative and a GAL is advocating for the child's best interests, "Section 2313(a) does not require the appointment of another lawyer to . . . advance[e] the child's unknowable preference").

Here, the evidence reflects that not only was Child very young at the time of the termination hearing—two years and three months old—but there was also evidence showing that Child was pre-verbal. *See* N.T., 10/3/23, at 24 (stating that Child's speech was delayed and speech services would be implemented). Therefore, in these circumstances and in accordance with *T.S.*, we conclude that the trial court did not violate Section 2313(a) by not appointing legal interests counsel for Child, and Child was properly represented at the hearing solely by his GAL. Nevertheless, we remind the trial court of its obligation under Section 2313(a) to appoint legal interests counsel for children in contested termination proceedings.

The record reflects that Father completed or nearly completed several of his single case plan objectives.  He obtained suitable housing and provided a copy of his lease.  *Id.* at 17.  Father also maintained employment.  *Id.* at 19, 28.  Father completed a parenting class.  *Id.*  Father also was engaged in domestic violence counseling and, as of two months prior to the hearing, was finishing up his counseling.  *Id.* at 19-20.

However, Father's drug use remained problematic and unaddressed. *Id.* at 18-19, 27.  Mensinger discussed several recent random drug screens that Father provided; he tested positive for marijuana twice in August 2023, and he does not have a medical marijuana card.  *Id.* at 18-19.  Furthermore, on September 12, 2023, Father tested positive for cocaine, marijuana, and PCP.  *Id.* at 19.  Mensinger testified that Father was engaged in drug and alcohol treatment and that she had spoken to his counselors at the treatment facility who stated that "he was trying," notwithstanding his positive tests.  *Id.* at 17-18.  Despite being required to engage in behavioral health treatment, CUA had not received any evidence that he had engaged with a provider.  *Id.* at 17.

With respect to visitation, Mensinger testified that Father previously missed approximately half of the offered weekly, two-hour visits; however, in the eight-month period prior to hearing, he would only miss one or two of every twelve visits offered.  *Id.* at 13-14, 20-21, 25.  Mensinger stated that Father behaves appropriately during the visits and brings Child toys and

snacks. *Id.* at 21, 29. However, the visits have never progressed to unsupervised visits outside of the CUA office. *Id.* at 40.

Mensinger testified that, despite Father having completed or nearly completed many of his objectives, his compliance remained minimal. *Id.* at 27-28. This was because of his "ongoing drug use," which Mensinger described as a "prevalent issue of the case." *Id.* at 27. Mensinger testified that Father's PCP and cocaine use, in particular, were "very concerning" to CUA. *Id.* When pressed on cross-examination by Father's counsel whether a minimal rating was appropriate in light of Father's accomplishments, Mensinger stated that she "would still rate him minimal based on the severity of the drug use, the age of the child[,] the length of time this case has been open, and the drug use has remained the same." *Id.* at 28.

Regarding Father's relationship with Child, Mensinger testified that Child initially would cry hysterically when left with Father during visits, but he has grown more comfortable with Father over time. *Id.* at 21, 26. However, while visits between Father and Child go well and they are affectionate with each other, Mensinger stated there does not appear to be a parent-child bond between the two. *Id.* at 21-22, 29-30. Rather, there is more of a "familiar bond," where Child "knows he comes once a week to [CUA's] office[, h]e gets snacks[, h]e plays with toys[,] and then he goes." *Id.* at 22, 26, 29. Child is not upset at the end of visits and will raise his arms to be picked up without hesitation when the CUA worker signals that the visit is concluding. *Id.* at 21,

26; *see also id.* at 22 ("[Child] doesn't appear to have an attachment on departure or arrival for the visits.").

On the other hand, Mensinger stated that she has viewed Child in the foster mother's home, and they have a strong parent-child bond. *Id.* at 22-23. Child "hang[s] all over" the foster mother during visits and runs after her whenever she moves around the home. *Id.* at 23. Child looks to the foster mother, who is interested in adopting Child, for love, protection, and support, and Child is safe in that home. *Id.* at 23-25. The foster mother cares for all of Child's needs, including his medical and dental appointments, and she is pursuing speech services based upon his delayed speech. *Id.* at 23-24. Mensinger thus opined that Child would not suffer irreparable harm if Father's parental rights were terminated because Child's visits with Father are just "something he does once a week," and Father is "not a permanent fixture in his life," unlike the foster mother. *Id.*

Father testified that he has a "very strong bond" with Child considering the two-hour visitation that he is provided per week. *Id.* at 33. Father indicated that he has three other children who spend time with him regularly and that Child has a large extended family on his side. *Id.* at 33, 36. Father stated that he works hard to provide for all of his children and that Child would not want for anything if his parental rights were not terminated. *Id.* at 33-34. Father testified there are clothes, toys, and a stroller in his home if he were allowed to take Child home with him. *Id.* at 35-36. Father acknowledged that he "messed up" and he is "not perfect" but said that he is

- 7 -

"working on that now," including by going to drug treatment twice a week.
***Id.*** at 34-35.

Following the hearing, the trial court issued a decree terminating Father's parental rights and an order granting the goal change petition. Father filed timely notices of appeal.[2] These appeals were then consolidated *sua sponte* by this Court.

Father raises three issues on appeal:

1. Did the trial court err as a matter of law or abuse[] its discretion where it determined that the requirements of 23 Pa.C.S.[ §] 2511(a) to terminate [Father's] parental rights were met[?]

2. Did the trial court err as a matter of law or abuse[] its discretion where it determined the requirements of 23 Pa.C.S.[ §] 2511(b) were met[?]

3. Did the trial court err as a matter of law or abuse its discretion where it determined that the permanency goal for [Child] should be changed to adoption[?]

Father's Brief at 3 (suggested answers omitted).

Father's first two issues address the decree terminating his parental rights to Child. We begin our analysis with our well-settled standard of review:

_____

[2] Father filed a concise statements of errors complained of on appeal concurrently with her notice of appeal, as required by Pa.R.A.P. 1925(a)(2)(i), and the trial court issued a consolidated opinion addressing the issues raised at both appeals.

The trial court also granted the termination petition as to Mother, and Mother appealed from the decree terminating her parental rights and the goal change order. Those appeals are pending before this Court at Nos. 2779 EDA 2023 and 2780 EDA 2023.

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In the Interest of J.R.R.*, 229 A.3d 8, 11 (Pa. Super. 2020) (quoting *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013)).

The burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. *In the Interest of L.W.*, 267 A.3d 517, 522 (Pa. Super. 2021). The clear and convincing evidence standard is defined as "testimony that is so clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *Id.* (citation omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act. "Subsection (a) provides eleven enumerated grounds describing particular conduct of a parent which would warrant involuntary termination[.]" *In re Adoption of C.M.*, 255 A.3d 343, 359 (Pa. 2021); *see* 23 Pa.C.S. § 2511(a)(1)-(11). If the trial court determines the petitioner established grounds for termination under Section 2511(a) by clear and convincing evidence, the court then must proceed to assess the petition under

subsection (b), which focuses on the child's needs and welfare.  **_T.S.M._**, 71 A.3d at 267.

Here, the trial court terminated Father's parental rights pursuant to Sections 2511(a)(1), (2), (5), and (8), and subsection (b).  However, this Court may affirm the court's decision to terminate if we agree with its determination concerning any one subsection of Section 2511(a), as well as Section 2511(b).  **_See In re B.L.W._**, 843 A.2d 380, 384 (Pa. Super. 2004) (_en banc_).  We focus our analysis on Section 2511(a)(2) and (b), which provide as follows:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> *          *          *
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> *          *          *
>
> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.  . . .

23 Pa.C.S. § 2511(a)(2), (b).

Under Section 2511(a)(2), "the moving party must prove by clear and convincing evidence that there is (1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." *In re Adoption of L.A.K.*, 265 A.3d 580, 600 (Pa. 2021).

> [S]ubsection (a)(2) does not emphasize a parent's refusal or failure to perform parental duties, but instead emphasizes the child's present and future need for essential parental care, control[,] or subsistence necessary for his physical or mental well-being. Therefore, the language in subsection (a)(2) should not be read to compel courts to ignore a child's need for a stable home and strong, continuous parental ties, which the policy of restraint in state intervention is intended to protect. This is particularly so where disruption of the family has already occurred and there is no reasonable prospect for reuniting it.

*In re Z.P.*, 994 A.2d 1108, 1117 (Pa. Super. 2010) (citation and emphasis omitted).

The grounds for termination under Section 2511(a)(2) are not limited to affirmative misconduct, but also include refusal and parental incapacity that cannot be remedied. *Id.*; *In re Adoption of A.H.*, 247 A.3d 439, 443 (Pa. Super. 2021). "Parents are required to make diligent efforts toward the reasonably prompt assumption of full parental duties." *A.H.*, 247 A.3d at 443. "A parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous." *Z.P.*, 994 A.2d at 1118 (citation omitted).

- 11 -

"[W]hen a parent has demonstrated a continued inability to conduct [his] life in a fashion that would provide a safe environment for a child, whether that child is living with the parent or not, and the behavior of the parent is irremediable as supported by clear and competent evidence, the termination of parental rights is justified." *Id.* (citation omitted).

Father argues that there was insufficient evidence to support termination under Section 2511(a)(2) where "DHS provided no testimony at all regarding Father's incapacity to parent" Child, "[n]ot one word." Father's Brief at 12-13. Contrary to showing any incapacity, Father asserts that the testimony at the hearing established that he "was already parenting another child who lived with him," he "was working very hard and had completed most of his single case plan goals," and he "was very appropriate in visits with" Child. *Id.* at 13.

In explaining its rationale for terminating Father's parental rights under Section 2511(a)(2), the trial court found the testimony of Mensinger, the CUA case manager, to be credible regarding Father. Trial Court Opinion, 1/22/24, at 18; N.T., 10/3/23, at 51-52. The court noted that Father was repeatedly orally advised of his single case plan objectives, which remained consistent. Trial Court Opinion, 1/22/24, at 18. The court found that, while Father had complied with some of his objectives, he had "not complied with the main issue of concern, which is his repeated illegal drug use throughout the life of the case." *Id.* The court found that, despite being repeatedly advised of "the seriousness of abstaining from the illegal drug use," he continued to test

- 12 -

positive for PCP, marijuana, and cocaine, "indicat[ing] to the [c]ourt that nothing has changed in regard to Father's drug use issues." *Id.* at 19-20. The trial court thus "found that Father does not have the ability to parent [Child] because of his continued illegal drug use." *Id.* at 20.

Upon review, we find that the trial court's findings are supported by the record and consistent with our caselaw. While Father argues that no evidence was asserted of his parental incapacity, the record belies this assertion. Rather, there was significant, unrefuted evidence to show that Father had an unresolved drug habit. Mensinger testified that father's abuse of illegal drugs, which remained consistent over the entire history of the case and specifically involved PCP, cocaine, and non-medical marijuana use, was "very concerning" to CUA and demonstrated that Father had only made minimal progress in addressing the objectives the agency had laid out for him. N.T., 10/3/23, at 27-28. Additionally, Father was incarcerated on two occasions during the course of Child's dependence, at least one of which was based upon DUI charges. Our caselaw firmly establishes that a parent's consistent substance abuse issues, and the repercussions resulting therefrom, are sufficient to establish parental incapacity under Section 2511(a)(2). *See, e.g.*, *In the Interest of K.M.W.*, 238 A.3d 465, 474 (Pa. Super. 2020) (mother's substance abuse issues and periods of incarceration were sufficient to show parental incapacity); *Z.P.*, 994 A.2d at 1125 (parent's "repeated drug use and criminal activity . . . show[ed] a pattern of incapacity to parent"). Accordingly, the trial court did not err or abuse its discretion in concluding under Section

- 13 -

2511(a)(2) that Father was incapable of providing Child with essential parental care, control, or subsistence as a result of his drug use over the more than two-year period since Child's removal and that Father could not remedy this incapacity.

We next turn to the trial court's finding that termination of Father's parental rights best served Child's "developmental, physical and emotional needs and welfare" under Section 2511(b). 23 Pa.C.S. § 2511(b). "The emotional needs and welfare of the child have been properly interpreted to include intangibles such as love, comfort, security, and stability." *T.S.M.*, 71 A.3d at 267 (citation and quotation marks omitted); *see also In the Interest of K.T.*, 296 A.3d 1085, 1106 (Pa. 2023). "Notably, courts should consider the matter from the child's perspective, placing her developmental, physical, and emotional needs and welfare above concerns for the parent." *K.T.*, 296 A.3d at 1105.

Our Supreme Court has consistently mandated that any Section 2511(b) analysis "requires consideration of the emotional bonds between the parent and child." *T.S.M.*, 71 A.3d at 267 (citing *In re E.M.*, 620 A.2d 481 (Pa. 1993)). Specifically, "[c]ourts must determine whether the trauma caused by breaking [the parent-child] bond is outweighed by the benefit of moving the child toward a permanent home." *Id*. at 253 (cleaned up). The recognized threshold for this required bond inquiry is whether termination will sever a "necessary and beneficial relationship," causing the child to suffer "'extreme

emotional consequences' or significant, irreparable harm." **K.T.**, 296 A.3d at 1109-10 (quoting **E.M.**, 620 A.2d at 484).

"[A] court conducting the Section 2511(b) needs and welfare analysis must consider more than proof of an adverse or detrimental impact from severance of the parental bond." **Id.** at 1113. Our Supreme Court has explained that the court should consider, as appropriate, the child's need for permanency and length of time in foster care, the child's placement in a pre-adoptive home and whether there is a bond with the foster parents, and whether the foster home meets the child's developmental, physical, and emotional needs. **Id.** Nonetheless, there is no "exhaustive list" of factors that must be considered by a trial court in this context. **Id.** at 1113 n.28.

Father argues that DHS failed to prove that there did not exist a parental bond between him and Child, as evidence demonstrated their improved relationship over the course of the case and the physical affection between the two. Father contends that the "bond could have become even greater if Father's visits were expanded to more than once a week" and if they were given "more time together to make it a stronger parent[-]child bond." Father's Brief at 19. Father further argues that the trial court erred by relying solely on the "scant evidence" of Mensinger's testimony regarding Father's relationship with Child in concluding that no parent-child bond existed as "more is required" in this case. **Id.** at 18.

The trial court addressed the Section 2511(b) analysis both at the conclusion of the hearing and in its opinion, and we quote the discussion in the opinion which mirrors the court's oral findings:

The [c]ourt found credible the testimony from Ms. Mensinger that there is no parent-child bond between Father and [Child]. According to Ms. Mensinger, Father and [Child] have more of a familiarity between them as [Child] has gotten to know Father from the visits, however, there is no attachment to Father and [Child] does not have any problem leaving Father at the end of the visits. The Court heard testimony as to the strong relationship between [Child] with the current caregiver, and that all [Child's] basic needs are being met and [Child] looks to his caregiver for love, protection, and support. [Child] has been with the caregiver since August 2021 and it is a pre-adoptive home. Ms. Mensinger testified that termination of parental rights would not have a detrimental effect or cause any irreparable harm on the developmental, physical[,] and emotional needs of [Child].

The Court found that there is no parental bond between Father and [Child]. The Court also found that [Child] has a very strong parental bond with his caregiver, the caregiver is a pre-adoptive home, and the impact of termination did not outweigh the benefit of moving [Child] toward a permanent adoptive home. The pre-adoptive home is meeting [Child's] developmental, physical, and emotional needs, including [Child's] need of love, comfort, security, safety, and stability. Consequently, the termination of Father's parental rights would be in the best interest of the child pursuant to [Section] 2511(b).

There was testimony from Father that demonstrated a genuine interest and an effort to maintain a parent-child relationship with [Child]. The Court does not doubt that Father loves [Child]. However, Father himself testified that he has "messed up" in regard to his drug and alcohol issues. Despite many opportunities, Father has not been able to prove to the Court that he get can past his illegal drug use issues that have been there throughout the life of this case. The Court considered all of the evidence and testimony before it as well as the permanency interest of [Child] in making its decision.

> Based upon the testimony and evidence presented at the . . . [h]earing, the [c]ourt found clear and convincing evidence . . . that the termination of Father's parental rights would be in the best interest of the child pursuant to [Section 2511(b).

Trial Court Opinion, 1/22/24, at 20-21 (record citation omitted); **see also** N.T., 10/3/23, at 52-55.

The trial court's findings and conclusions are amply supported by the record. Mensinger's testimony, which the trial court found to be credible, established that, despite the affection between Father and Child, Child does not look to Father for parental support, is not upset when leaving him, and they share a "familiar bond" rather than a parent-child bond. N.T., 10/3/23, at 21-22, 26, 29-30. Mensinger's testimony further showed that Child has a strong parental bond with his foster mother, with whom he has lived for almost his entire life and who is a pre-adoptive resource, and she meets his developmental, physical, and emotional needs. **Id.** at 22-25.

The trial court was within its discretion to "equally emphasize the safety needs of" Child in its Section 2511(b) analysis, **see Interest of M.E.**, 283 A.3d 820, 837 (Pa. Super. 2022) (citation omitted), where Father demonstrated, by his continued drug use throughout the case, that he was incapable of providing a safe and secure home for Child. Moreover, the court appropriately rejected Father's request for additional time to develop a stronger bond with Child where there was no reasonable prospect for an imminent reunification with Child. **See K.T.**, 296 A.3d at 1107-08 (noting that federal law requires agencies to move for termination when child has

been in foster care for fifteen of prior twenty-two months and trial courts "must keep the ticking clock of childhood ever in mind" and ensure that dependent children find permanency "in a timely fashion") (citation omitted). Finally, while Father argues that the trial court erred by relying solely on Mensinger's testimony, it is well-settled that Section 2511(b) does not require a formal bonding evaluation, and the court may rely on the opinion of caseworkers in place of expert testimony. *In re Adoption of J.N.M.*, 177 A.3d 937, 944 (Pa. Super. 2018); *Z.P.*, 994 A.2d at 1121.

We therefore conclude that Father has not shown grounds to overturn the trial court's decision to terminate her parental rights under Section 2511(a)(2) and (b). In Father's final issue, he challenges the change of Child's permanent placement goal from reunification to adoption. Given our decision to affirm the trial court's termination decree, any challenge to the goal change order is moot. *See A.H.*, 247 A.3d at 446 ("[T]he effect of our decision to affirm the [trial] court's termination decree necessarily renders moot the dependency court's decision to change [a c]hild's goal to adoption."); *see also In the Interest of A.R.*, 311 A.3d 1105, 1114 (Pa. Super. 2023); *In the Interest of A.M.*, 256 A.3d 1263, 1272 (Pa. Super. 2021). We accordingly also affirm the trial court's goal change order. *A.R.*, 311 A.3d at 1114; *A.M.*, 256 A.3d at 1272-73.

Decree affirmed. Order affirmed.

Judgment Entered.

Benjamin D. Kohler

Benjamin D. Kohler, Esq.
Prothonotary

Date: 6/21/2024